**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JESSICA DODSON for L.G., | ) | CASE NO. 1:13-CV-02042 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Jessica Dodson ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Commissioner of Social Security ("the Commissioner"), denying the

application of Plaintiff's son, L.G. ("Claimant"), for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned United States Magistrate Judge pursuant to the consent of the parties

entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On November 8, 2010, Plaintiff filed an application for SSI on behalf of Claimant,

alleging that Claimant first became disabled on September 25, 2010.[1]  (Transcript

("Tr.") 12.)  The application was denied initially and upon reconsideration, and Plaintiff

requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On April 24,

---

[1]    Claimant's alleged disability onset date was later amended to November
8, 2010.  (Tr. 12.)

2012, an ALJ conducted Claimant's hearing.  (*Id.*)  Claimant participated in the hearing and was represented by an attorney.  (*Id*.)  Plaintiff also participated in the hearing. (*Id*.)  At the ALJ's request, an impartial medical expert also appeared and testified.  (*Id.*) On July 27, 2012, the ALJ found Claimant not disabled.  (Tr. 9.)  On August 14, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On September 15, 2013, Plaintiff filed a complaint on behalf of Claimant challenging the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14 and 15.)

Plaintiff asserts the following assignments of error: (1) the ALJ erred in assigning less than controlling weight to the opinions of Claimant's treating psychiatrist and psychologist; and (2) the ALJ erred in finding that Claimant was less than markedly impaired in health and physical well-being.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Claimant was born in January 2002 and was a school-age child from the amended alleged onset date through the date of the ALJ's hearing decision.  (Tr. 15.) Claimant had not engaged in substantial gainful activity at any time relevant to the disposition of his application.  (*Id*.)

### B.  Medical Evidence and School Reports

#### 1.  Asthma

Claimant has been consistently diagnosed with moderate persistent asthma.  (Tr.

2

342, 360, 516.)  He has received steroid injections and has been prescribed a nebulizer for asthma exacerbations.  (Tr. 489.)

On December 14, 2010, Claimant presented to MetroHealth Medical Center ("MetroHealth") with a cough.  (Tr. 342.)  He demonstrated trace wheezing after taking his nebulizer.  (*Id.*)  Doctors diagnosed him with moderate persistent asthma.  (Tr. 343.)

On September 7, 2011, Claimant returned to MetroHealth with a fever and other symptoms.  (Tr. 513-517.)  On examination, his lungs appeared to be normal and clear. (Tr. 514.)  Claimant was again diagnosed with moderate persistent asthma.  (Tr. 516.)

### 2.    Mental Health/Behavioral Issues

On December 17, 2010, Claimant presented to Kamal-Neil S. Dass, D.O., a psychiatrist.  (Tr. 340.)  Dr. Dass noted that school was "going well" for Claimant and that he had earned four A's, three B's, and one C on his report card.  (*Id.*)  There were no complaints from Claimant's teacher except that he rushed through his work and was sloppy.  (*Id.*)  Claimant was doing all of his class work and homework but was giving his mom a hard time by losing his temper, talking back to her, throwing things, and not wanting to brush his teeth.  (*Id.*)  Dr. Dass reported that Claimant's appetite decreased during the day, but he was "[e]ating well the rest of the day."  (*Id.*)  On examination, Claimant appeared neat, clean, and cooperative.  (*Id.*)  He maintained good eye contact and his judgment and insight were good.  (*Id.*)

Plaintiff returned to Dr. Dass on March 2, 2011.  (Tr. 500-501.)  Dr. Dass noted that school was going well and that Claimant made the Merit Roll.  (Tr. 501.)  Claimant's teachers had no complaints except that Claimant rushed through his work and was

3

sloppy.  (*Id.*)  He was doing well at home except for lingering anger and hygiene issues.  (*Id.*)  His appetite still decreased during the day, but he ate well the rest of the day.  (*Id.*)  On examination, Dr. Dass observed Claimant to be neat, clean, and cooperative.  (*Id.*)  Claimant had good eye contact and normal speech rate and volume.  (*Id.*)  He maintained a good mood and a full affect.  (*Id.*)  Claimant appeared alert and oriented and retained logical thoughts, good insight, and good judgment.  (*Id.*)

On April 29, 2011, Kwyn L. Moffit, MA, CCC/SLOP, a consultative speech-language pathologist, found that Claimant had mildly impaired language scores and severely impaired articulation scores.  (Tr. 482-484.)  Ms. Moffitt noted that Claimant was "in near constant motion" in his chair during the entire appointment, but was pleasant, cooperative, and "able to attend to the situation without cuing."  (Tr. 484.)  Ms. Moffitt determined that with intensive speech language therapy, Claimant's prognosis for improved speech skills was good.  (*Id.*)

Plaintiff returned to Dr. Dass on May 17 and August 22, 2011.  (Tr. 503-504, 506-507.)  On both occasions, Dr. Dass reported that Claimant continued to do well in school.  (Tr. 503, 506.) Claimant was earning As, Bs, and a few Cs and had made the Merit Roll.  (*Id.*)  He was completing his class work and homework.  (*Id.*)  He continued to have anger and hygiene issues at home.  (*Id.*)  Claimant had been more "mouthy" leading up to his August 22nd visit.  (Tr. 506.)  He continued to have a decreased appetite during the day but ate well the rest of the day.  (Tr. 503, 506.)  On examination, Dr. Dass observed Claimant to be neat, clean, and cooperative.  (Tr. 504, 506.)  Claimant had good eye contact and normal speech rate and volume.  (*Id.*)  He

4

maintained a good mood and a full affect.  (*Id.*)  No hallucinations, delusions, or suicidal/homicidal ideation were present.  (*Id.*)  He appeared alert and orientated and retained logical thoughts, good insight, and good judgment.  (*Id.*)  His memory, concentration, and abstraction remained normal.  (*Id.*)

On September 14, 2011, Claimant presented to Beech Brook for a Client Readmission Assessment.  (Tr. 558-576.)  Claimant appeared unremarkable, but had decreased impulse control and frustration tolerance.  (Tr. 558.)  He reported self-mutilative urges/ideation, but denied suicidality or homicidality.  (Tr. 559.)  In addition, Claimant had unremarkable behavior, affect, mood, speech, intellectual functioning, thought content, and thought processes.  (*Id.*)  He had no significant development delays.  (Tr. 560.)

Claimant returned to Dr. Dass on November 21, 2011.  (Tr. 521-522.)  Dr. Dass' notes indicate that school was "going well" and that Claimant had A's in gym and music, a B in social studies, and two D's in math and reading on his report card.  (Tr. 522.)  Claimant's teacher complained that he was not paying attention and not turning in his homework, and that he talked too much in class and interfered with others.  (*Id.*)  Nonetheless, Claimant continued to do all of his homework.  (*Id.*)  Things were "going OK" at home, but Claimant had been more "mouthy" and still lost his temper with his mother and did not want to bathe.  (*Id.*)  Claimant's appetite decreased during the day, but he ate well the rest of the day.  (*Id.*)  On examination, Claimant appeared neat, clean, and cooperative.  (*Id.*)  He maintained good eye contact and normal speech rate and volume.  (*Id.*)  He had a good mood and full affect.  (*Id.*)  He appeared alert and

oriented; his thoughts, memory, concentration, and abstraction were normal; and his insight and judgment were good.  (*Id.*)

On January 17, 2012, Claimant presented to Fairview Hospital with anxiety-related swallowing problems.  (Tr. 548-550.)  On February 18, 2012, a lateral x-ray of Claimant's neck was unremarkable.  (Tr. 555.)  A frontal and lateral x-ray taken that same day revealed prominent tonsillar soft tissues.  (Tr. 557.)  Doctors recommended clinical correlation to assess the airways.  (*Id.*)

On February 15, 2012, Dr. Dass completed a "Questionnaire Health Care Professionals on Medical and Functional Equivalence."  (Tr. 530-533.)  Therein, he opined that Claimant had a moderate limitation in acquiring and using information; an extreme[2] limitation in attending and completing tasks; a marked[2] limitation in interacting and relating with others; a marked limitation in caring for self; and a moderate limitation in health and physical well-being.  (Tr. 530-532.)  Dr. Dass also indicated that Claimant had a decreased appetite.  (Tr. 532.)

On February 18, 2012, Claimant presented to MetroHealth with complaints of choking episodes.  (Tr. 580.)  Claimant reported breathing troubles related to trouble with swallowing.  (*Id.*)  Plaintiff remained alert and conversant during the episodes of choking.  (*Id.*)  Treatment notes indicate that Claimant reported that he did not

---

[2]    "Extreme" was defined on the form as follows: "No meaningful function in a given area. Testing is usually three standard deviations below the norm."  (Tr. 530.)

[2]    "Marked" was defined on the form as follows: "Interferes seriously with the child's ability to function independently, appropriately, and effectively in an age appropriate manner.  Testing is usually two standard deviations below the norm."  (Tr. 530.)

6

remember the choking episodes immediately after they occured, but at the doctor's office he admitted that he lied about not remembering them.  (Tr. 580.)  On examination, Claimant appeared alert, cooperative, and in no distress.  (Tr. 581.)  He had a supple and non-tender neck with no adenopathy or nodularity and a normal-sized thyroid.  (*Id.*)  Doctors suspected that Claimant's choking symptoms were anxiety-related.  (*Id.*)

On February 20, 2012, Claimant complained to Dr. Dass that he had difficulty with swallowing.  (Tr. 577.)  He reported being afraid to eat solid food.  (*Id.*)  Dr. Dass noted that school was "going well" and that Claimant had A's, B's, and C's on his report card.  (*Id.*)  Claimant's teacher complained that he did not pay attention, did not turn in his homework, rushed, and was sloppy.  (*Id.*)  Claimant also talked too much and interfered with others.  (*Id.*)  Claimant did all of his class work, but his mother had to harass him to complete his homework.  (*Id.*)  At home, Claimant displayed anger and hygiene issues.  (*Id.*)  He was very anxious and had decreased appetite during the day.  (*Id.*)  On examination, Claimant appeared neat, clean, and cooperative and had good eye contact and normal speech rate and volume.  (*Id.*)  His mood was good and his affect was full.  (*Id.*)  His thoughts were logical in form and content; he had normal memory, concentration, and abstraction; and his judgment and insight were good.  (*Id.*)

On March 13, 2012, Claimant underwent a Mental Health Assessment/Parent Interview with Britt A. Nielsen, Psy.D.  (Tr. 583-589.)  Claimant's mother reported that Claimant would sometimes hyperventilate.  (Tr. 583.)  She also reported that Dr. Dass increased Claimant's Lexapro, which helped with his anxiety.  (Tr. 584.)  Claimant

chewed, but did not swallow, some of his food, although Dr. Nielsen noted no significant weight decrease.  (*Id.*)  Claimant's appetite increased in the evening, and he would sneak snacks and food.  (*Id.*)  Dr. Nielsen noted that Claimant constantly moved and did not like to bathe or brush his teeth.  (*Id.*)  He often stayed up until the early morning playing video games.  (Tr. 584, 586.)  He did not respect his parents, lied about some things, and threw tantrums.  (Tr. 584, 586.)  Claimant's behavior at school was described as "good" other than one conflict he had with a peer.  (Tr. 586.)  Claimant's teacher said that Claimant rushed through his work, wrote sloppily, and had descending grades.  (*Id.*)  Claimant sometimes left schoolwork blank and refused to do his homework.  (*Id.*)

Claimant returned to Dr. Nielsen on March 19, 2012.  (Tr. 590-595.)  On examination, he appeared neat, clean, and appropriately dressed.  (Tr. 590.)  He fidgeted, but cooperated.  (*Id.*)  He had normal eye contact and displayed a euthymic mood and a full affect.  (*Id.*)  His attention and cognition were within normal limits.  (*Id.*)  Although he had poor speech articulation, he used appropriate language.  (*Id.*)  He appeared oriented, with logical and organized thoughts and no abnormal processes or behaviors.  (*Id.*)  His memory, insight, and judgment were normal.  (*Id.*)  When questioned by Dr. Nielsen, Claimant stated that he did not like school because it was not fun.  (Tr. 591.)  He described his home as a happy place without much yelling.  (*Id.*)  He reported getting into trouble when he stayed up late to play video games, lost things like his father's phone, and did not listen to his parents.  (*Id.*)  Claimant denied getting into trouble at school.  (*Id.*)  He reported having a hard time eating because he feared

8

he would choke.  (*Id.*)

On April 30, 2012, Dr. Nielsen completed a "Questionnaire Health Care Professionals on Medical and Functional Equivalence."  (Tr. 596-599.)  Dr. Nielsen opined that Claimant had a moderate limitation in acquiring and using information; a marked limitation in attending and completing tasks; a moderate limitation in interacting and relating with others; a marked limitation in caring for self; and a moderate limitation in health and physical well-being.  (Tr. 596-598.)  Dr. Nielsen noted that Claimant was not eating at meals and was hiding food around the house, "however, his weight is at the 59th% as of 2/20/12."  (Tr. 598.)

### 3.     Teacher Questionnaires

On January 4, 2011, one of Claimant's teachers, Ellen Warger, completed a Teacher Questionnaire.  (Tr. 454-461.)  Ms. Warger noted that despite attending speech class for 30 minutes per week, Claimant read at his grade level and wrote near it.  (Tr. 454.)  His math skills were also at grade level.  (*Id.*)  Furthermore, Claimant had no unusual degree of absenteeism.  (*Id.*)  Ms. Warger also reported that Claimant had no problems with acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for himself; and health and physical well-being.  (Tr. 455-460.)  Ms. Warger noted that Claimant "is a decent student in all subjects and excels at math.  He gets along well with peers + adults."  (Tr. 463.)  Ms. Warger also described Claimant as "well-mannered" most of the time.  (*Id.*)  She noted that Claimant qualified for speech intervention due to his difficulty pronouncing certain letters.  (*Id.*)

On January 31, 2012, another one of Claimant's teachers, Maureen Oaklief,

9

completed a "Questionnaire Health Care Professionals on Medical and Functional Equivalence."  (Tr. 526-529.)  Ms. Oaklief opined that Claimant had a marked limitation in acquiring and using information; a marked limitation in attending and completing tasks; a marked limitation in interacting and relating with others; a marked limitation in moving about and manipulating objects; an extreme limitation in caring for self; and a marked limitation in health and physical well-being.  (Tr. 526-528.)  Ms. Oaklief noted that Claimant was extremely anxious and had anxiety attacks lasting up to a couple days.  (Tr. 528.)  Additionally, she noted that Claimant did not function well in class. (*Id.*)

### D. Hearing Testimony

#### 1. Claimant's Hearing Testimony

Claimant testified that he was in the fourth grade and was improving his grades at school.  (Tr. 43-44.)  He stated that he got along well with all but one of his peers. (Tr. 46.)  Claimant had trouble completing his homework "[b]ecause it's too hard and I just want to be able to do something fun and not do my homework."  (Tr. 45.)  Claimant testified that he did not do his chores at home because he would rather have fun.  (Tr. 47.)  He reacted poorly when his parents took away his video games.  (*Id.*)  Claimant reported that he bounced often, shook when he was nervous, and hid his food. (Tr. 49-51.)  He testified that he did not like eating his food because he was "just not hungry for some reason."  (Tr. 52.)  Claimant saw a counselor once a week who helped him with his anxiety and with controlling his anger.  (Tr. 48.)

#### 2. Plaintiff's Hearing Testimony

Plaintiff, Claimant's mother, testified at Claimant's hearing.  She stated that the testimony Claimant provided was accurate.  (Tr. 56.)  She also acknowledged that

10

Claimant's medications improved his symptoms "[f]or the most part." (*Id.*)  She further noted that Claimant was on the Merit Roll and got along okay with teachers and students.  (*Id.*)  Claimant's teacher had informed Plaintiff that Claimant seemed more interested in other children's issues, which made him either not complete or race through his work.  (Tr. 65.)

Plaintiff testified that Claimant performed well at school but was different at home.  (Tr. 59.)  He constantly moved and had to be reminded to do his homework.  (Tr. 56.)  He refused to eat his dinner and preferred junk food.  (Tr. 56-57.)  Plaintiff testified that she dealt with Claimant's behavior at home because she knew his medication wore off by the time he got home from school and she did not want to give him medication constantly.  (Tr. 59.)  She also stated that Claimant's doctor had explained that the increased dose of Lexapro was still in its beginning stages and that it would take four to six weeks for it to take full affect.  (Tr. 60.)

Plaintiff reported that Claimant's treating psychiatrist was Dr. Dass and that Claimant also saw a counselor every week and was in treatment with a psychologist at MetroHealth.  (Tr. 60-61.)  She also stated that Claimant was receiving speech therapy once per week.  (Tr. 61.)

### 3.        Medical Expert's Hearing Testimony

Dr. Arthur Newman, a board-certified doctor in pediatric hematology/oncology and pediatric rheumatology and a retired professor of pediatrics, testified as a medical expert (ME) at Claimant's hearing.  The ME testified that Claimant did not meet or medically equal a child's listing for asthma or a mental health/behavioral condition.  (Tr. 74-82.)  Regarding functional equivalence, the ME testified that Claimant had a less

11

than marked limitation in acquiring and using information; a marked limitation in attending and completing tasks; a less than marked limitation in interacting with others; no limitation in moving about and manipulating objects; a less than marked limitation in caring for himself; and a less than marked limitation in health and physical well-being. (Tr. 82-83.)

### III.    STANDARD FOR DISABILITY

An individual under the age of 18 shall be considered disabled if he has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002) (per curiam).  There is a three-step analysis for determining whether a child-claimant is disabled.  First, the Commissioner must determine whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Second, if the child is not engaged in substantial gainful activity, the Commissioner must determine whether the child suffers impairments or a combination of impairments that are "severe" and that are expected to result in death or have lasted or are expected to last for a continuous period of not less than 12 months.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  Third, if the child suffers a severe impairment or combination of impairments that meet the Act's durational requirement, the Commissioner must determine whether they meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. §

416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.  If the child's severe impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the Listings, the child will be found disabled.  *See* 20 C.F.R. § 416.924(a); *Miller ex rel. Devine*, 37 F. App'x at 148.

To determine whether a child's impairment functionally equals the Listings, the Commissioner assesses the functional limitations caused by the impairment in six domains of functioning:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a.  An impairment functionally equals the Listings if the child has a "marked" limitation in two domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Claimant was born in January 2002.  At all times from November 8, 2010, the amended alleged onset date, through the date of this decision, he was and is a school-age child.

2.    Claimant has not engaged in substantial gainful activity since November 8, 2010, the application date.

3.    From November 8, 2010, the amended alleged onset date, through the date of this decision, Claimant had and has the following severe

13

impairments:
- Attention deficit hyperactivity disorder (ADHD)
- Oppositional defiant disorder (ODD)
- Anxiety Disorder, which includes Claimant's symptoms of swallowing difficulties
- Speech/language disease NEC
- Developmental language disorder
- Asthma

4. Claimant did not and does not have an impairment that met, meets, medically equaled, or medically equals the severity of one of the Listed Impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. Claimant did not and does not have an impairment or combination of impairments that functionally equaled or equals the severity for any Listed Impairment.

6. Claimant was not and is not disabled, as defined in the Social Security Act, from November 8, 2010, the amended alleged onset date, through the date of this decision.

(Tr. 15-25.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ. *Id.* However, courts do not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

14

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.

**B.    Plaintiff's Assignments of Error**

**1**.    **The ALJ Erred in Assigning Less than Controlling Weight to the Opinions of the Claimant's Treating Psychiatrist and Psychologist.**

Plaintiff argues that the ALJ erred in assigning less than controlling weight to the opinions of Claimant's treating psychiatrist, Dr. Dass, and treating psychologist, Dr. Nielsen.  Specifically, Plaintiff maintains that Dr. Dass and Dr. Nielsen's opinions that Claimant had a marked limitation in the area of "caring for self" are entitled to great weight.[3]  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is

_____

[3]    In her Brief on the Merits, Plaintiff asserts that Dr. Dass found Claimant to have an *extreme* limitation in the functional domain of caring for self. (Plaintiff's Brief ("Pl.'s Br.") 11.)  Plaintiff is mistaken, as a review of the record indicates that Dr. Dass, like Dr. Nielsen, opined that Claimant had a *marked* limitation in that area. (Tr. 532.)

inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Both Dr. Dass and Dr. Nielsen completed questionnaires wherein they opined that Claimant had a marked limitation in the area of "caring for self," which is defined as:

> [H]ow well a child maintains a healthy emotional and physical state, including how well the child gets his or her physical and emotional wants and needs met in appropriate ways; how the child copes with stress and change in his or her environment; and whether the child takes care of his or her own health, possessions, and living area.

(Tr. 532.)  The ALJ gave "no weight" to Drs. Dass and Nielsen's opinions that Claimant had a marked limitation with respect to caring for self.  (Tr. 25.)  As to Dr. Dass' opinion, the ALJ explained that it was not supported by his own treatment notes or by any other evidence in the record.  (*Id.*)  The ALJ further explained:

> With respect to caring for self, I note that there is evidence in the record that [Claimant] throws out his food rather than eats and that [Claimant's] parental discipline has been inconsistent and there is nothing in the record, but there is also no evidence in the record that [Claimant's] health has been adversely affected by him throwing out his food, or that he has been excessively absent from school for health reasons.

(*Id.*)  In giving no weight to Dr. Nielsen's opinion that Claimant had a marked limitation with respect to caring for self, the ALJ noted:

> Dr. Nielsen said that this was his opinion because [Claimant] had difficulty complying with his parents' requests, because he was argumentative, and because he threw out some of his food rather than eating it.  However, nothing in his treatment notes or in any other evidence in the record supports his opinion that [Claimant's] noncompliance with his parents [sic] requests and argumentativeness with them is at a "marked" level, or that his propensity for throwing out food has had an adverse impact on his health.  On the contrary, Dr. Nielsen himself noted in this questionnaire that [Claimant's] weight was at the 59%ile.

(*Id.*)

The ALJ offered "good reasons" for rejecting Drs. Dass and Nielsen's opinion that Claimant is markedly limited in the area of caring for self, and the following substantial evidence supports that conclusion:

- During the relevant period Drs. Dass and/or Nielsen found Claimant to be neat, clean, cooperative, and/or appropriately dressed.  (Tr. 340, 501, 504, 506, 522, 577, 590.)

- At appointments with Drs. Dass and/or Nielsen, Claimant consistently maintained good/normal eye contact and had normal speech rate and volume.  (Tr. 340, 501, 504, 506, 522, 577, 590.)

- Claimant consistently had a good/euthymic mood and a full affect.  (Tr. 340, 501, 504, 506, 522, 577, 590.)

- Drs. Dass and/or Nielsen consistently described Claimant has being alert and oriented; having no hallucinations, delusions, or suicidal/homicidal ideation; displaying logical/normal thoughts, good

17

insight, and/or good judgment; and having normal memory, concentration, attention, and/or abstraction.  (Tr. 340, 501, 504, 506, 522, 577, 590.)

- Despite a decreased appetite during the daytime, Claimant ate well the rest of the day.  (Tr. 501, 503, 506, 522, 577.)  On March 13, 2012, Dr. Nielsen noted that Claimant had "[n]o significant weight decrease."  (Tr. 584, 586.)

- In January 2011, Claimant's former teacher, Ms. Warger, opined that Claimant had no limitation in caring for himself.  (Tr. 459.)  She wrote that Claimant "is a decent student in all subjects and excels at math. He gets along well with peers + adults."  (Tr. 463.)  Ms. Warger also noted that Claimant was well-mannered most of the time.  (*Id.*)

- On April 29, 2011, Ms. Moffit, Claimant's speech-language pathologist, noted that despite Claimant's near constant motion, he was pleasant, cooperative, and "able to attend to the situation without cueing."  (Tr. 484.)

- On September 14, 2011, the Beech Brook staff observed Claimant to have unremarkable behavior, affect, mood, speech, intellectual functioning, thought content, and thought processes, and no significant delays.  (Tr. 559, 560.)

- The ME testified that Claimant had a less than marked limitation in caring for himself.  (Tr. 83.)

- As the Commissioner notes in her Brief, at Claimant's hearing, Plaintiff's counsel agreed with the ALJ that Dr. Dass' treatment notes did not support an extreme limitation in any of the six domains.  (Tr. 86.)  Plaintiff's counsel specifically stated: "In this situation, [Dr. Dass'] treatment notes, at no point in time, quantify the severity of his symptoms."  (Tr. 86-87.)

Thus, the ALJ did not err in assigning less than controlling weigh to the opinions of Drs. Dass and Nielsen, as the ALJ's conclusion is well-supported by evidence in the record.  Furthermore, Plaintiff has not convinced this Court that the ALJ's decision to assign more weight to the testimony of the ME was error.  An ME's testimony constitutes expert medical evidence upon which an ALJ may rely.  *See* S.S.R. 96-6p,

1996 WL 374180, at *1 (S.S.A.); *Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001).

As the ALJ explained, the ME's testimony, was "consistent with the weight of the evidence in the record."  (Tr. 25.)  Further, even if the ME's opinions were invalid, Plaintiff has failed to show that the ALJ's reliance on the ME's testimony was harmful. As discussed above, the ALJ adequately explained his reasons for assigning no weight to Drs. Dass and Nielsen's opinions that Claimant was markedly limited in the area of caring for self, and substantial evidence in the record–in addition to the ME's testimony–supports this conclusion.  For the foregoing reasons, Plaintiff's first assignment of error is without merit.

> **2.      The ALJ Erred in Finding that Claimant was Less than Markedly Impaired in Health and Physical Well-Being.**

Plaintiff argues that the ALJ erred in finding that Claimant was less than markedly impaired in the area of health and physical well-being.[4]  According to Plaintiff, substantial evidence supports a finding that Claimant is markedly limited in this area due to his moderate persistent asthma.  Plaintiff's argument is without merit.

Plaintiff is correct in asserting that Claimant has been diagnosed with moderate persistent asthma and has required in-office breathing treatments as well as prescriptions for steroids.  (Pl.'s Br. 16, citing Tr. 342, 347, 356, 365, 489, 495, 514.)

---

[4]      The area of health and physical well-being "considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's health and functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. . . .  The 'Health and Physical Well-Being' domain addresses how recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's health and sense of physical well-being."  (Tr. 23.)

Plaintiff is also correct in noting that Claimant's teacher, Ms. Oaklief, opined that Claimant was markedly limited in the area of health and physical well-being.  (Tr. 528.) Thus, there is evidence in the recording supporting Plaintiff's claim that Claimant has a marked limitation in this area.  But this is not the appropriate standard to apply to the ALJ's decision.  An ALJ's decision that is supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy, 594 F.3d at 512*.  Here, the ALJ appropriately considered Claimant's asthma and offered a detailed explanation for why Claimant's asthma did not meeting the relevant listing or rise to the level of being a "marked" limitation.  The following substantial evidence, as discussed by the ALJ, supports the ALJ's conclusion that Claimant has a less than marked limitation in health and physical well-being:

- Claimant was not having asthma attacks in spite of prescribed treatment occurring every two months or six times in a year.  (Tr. 16.)

- Claimant has not had persistent low-grade wheezing between asthma attacks with a need for daytime and nocturnal use of sympathomimetic bronchodilators for more than minimal amounts of time.  (Tr. 16.)

- Claimant's asthma symptoms have been stable for the most part.  (Tr. 23.)

- Claimant "was treated on a couple of occasions in his doctor's office with an Albuterol/Atrovent nebulized treatment but he has not had any emergency room or inpatient hospitalizations for this condition."  (Tr. 23.)

- Claimant is not absent from school very often.  (Tr. 23.)

- In February 2012, Claimant's treating physician, Dr. Dass, indicated in a questionnaire that Claimant has a moderate limitation in health and physical well-being.  (Tr. 24, 532.)

- Claimant's treating psychologist, Dr. Nielsen, indicated that Claimant has a moderate limitation in health and physical well-being.  (Tr. 24,

20

598.)

- Dr. Newman, the ME who testified at Claimant's hearing, opined that Claimant had a less than marked limitation in the functional domain of health and physical well-being.  (Tr. 25, 83.)

Accordingly, the ALJ appropriately found that Claimant had a less than marked limitation in health and physical well-being, and substantial evidence supports that conclusion.  Plaintiff's second assignment of error does not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 1, 2014

21